Shana E. Scarlett (SBN 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

*Counsel for Teamsters Health &
Welfare Fund of Philadelphia and
Vicinity and the Proposed End-Payor Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, on behalf of itself and all others similarly situated, | Civil Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TWI PHARMACEUTICALS INC., and TWI PHARMACEUTICALS USA, INC., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION .................................................................... 1

II.    PARTIES ............................................................................................ 4

III.   JURISDICTION, VENUE, AND COMMERCE .................................. 5

IV.    ECONOMIC AND REGULATORY BACKGROUND ......................... 6

    A.    Characteristics of the Prescription Pharmaceutical Marketplace ........................... 6

    B.    New Brand Name Drugs ........................................................... 8

    C.    The Hatch-Waxman Amendments Streamline Generic Entry ............................. 8

    D.    The Benefits of Generic Drugs ............................................... 11

    E.    Pharmaceutical Manufacturers Game the Regulatory Structure in Order to Impair Competition .................................................. 13

    F.    Authorized Generics and Their Value ..................................... 14

    G.    The Limits of Patent Protection for Drugs .............................. 16

V.     ANTICOMPETITIVE CONDUCT ..................................................... 17

    A.    Takeda's Development and Sale of Dexilant ........................... 17

    B.    Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic Manufacturers ................................................... 18

    C.    Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings ....................................................... 20

    D.    Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial ....................................................................... 22

    E.    Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda ................................................. 23

    F.    Takeda Entered into Other Alleged Improper Agreements with Competitors During this Same Time Period ..................... 26

    G.    In the Absence of Defendants' Agreement, Two Competing Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier ................. 27

-i-

**CLASS ACTION COMPLAINT**

VI.    MARKET POWER AND RELEVANT MARKET ......................................... 29

VII.   ANTITRUST IMPACT .......................................................................... 30

VIII.  ACCRUAL AND FRAUDULENT CONCEALMENT ................................. 30

IX.    CLASS ACTION ALLEGATIONS ........................................................ 31

X.     CLAIMS FOR RELIEF ....................................................................... 33

COUNT I: VIOLATION OF 15 U.S.C. § 1 (Against All Defendants For Injunctive
       Relief Only)......................................................................................... 33

COUNT II: VIOLATION OF 15 U.S.C. § 2 (Against Takeda For Injunctive Relief
       Only) ................................................................................................... 35

COUNT III: COMBINATION AND CONSPIRACY IN RESTRAINT OF
       TRADE UNDER STATE LAW (Against All Defendants)............................. 36

COUNT IV: MONOPOLIZATION UNDER STATE LAW (Against Takeda) ......................... 37

COUNT V: UNFAIR AND DECEPTIVE TRADE PRACTICES (Against All
       Defendants) ........................................................................................ 39

COUNT VI: UNJUST ENRICHMENT (Against All Defendants) ............................................. 40

XI.    REQUEST FOR RELIEF ....................................................................... 40

XII.   DEMAND FOR JURY TRIAL................................................................. 41

Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("Plaintiff"), on behalf of itself and in a representative capacity on behalf of members of the End-Payor Class (defined below), make this Complaint for relief against Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A. Inc., Takeda Pharmaceuticals America, Inc. (collectively, "Takeda") and TWi Pharmaceuticals, Inc. and TWi Pharmaceuticals USA, Inc. (collectively "TWi") (Takeda and Twi are referred to together as "Defendants"). Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiff alleges:

## I.    NATURE OF THE ACTION

1.    This lawsuit challenges a horizontal conspiracy and agreement among Defendants to restrain competition in the United States market for the pharmaceutical product Dexilant (dexlansoprazole) and its AB-rated generic equivalents.

2.    Defendants, competing pharmaceutical manufacturers, entered into a "reverse payment agreement," whereby a patent holder pays an alleged or potential infringer to stay off the market, not to challenge its patents, or otherwise not to compete with the patent holder in the market for the patented product. In a typical competitive market, the infringer pays damages and/or royalties to the patent holder. But in the "reverse payment" scenario, as alleged herein, the payment flows in the opposite direction. That is, the patent holder pays the alleged infringer to stay out of the market.

3.    Dexilant is a treatment for erosive esophagitis and symptoms of gastroesophageal reflux disease, also known as GERD.

4.    Since 2009, Takeda has sold branded Dexilant in the United States and generated billions of dollars in revenue from such sales.

5.    Beginning in 2010, generic pharmaceutical manufacturers began filing applications with the U.S. Food and Drug Administration ("FDA") seeking approval to market and sell generic versions of Dexilant to compete with Takeda's branded product.

6.    Takeda sued to stop this competition, claiming that these generic manufacturers would infringe one or more of Takeda's patents for the drug.

7.    Three of Takeda's lawsuits—against generic manufacturers TWi, Par, and Impax—

**CLASS ACTION COMPLAINT**

were consolidated and proceeded to trial in 2013 in this District.

8.      The trial court judge—the Honorable Joseph Spero—ruled in favor of the generic manufacturers with respect to certain patents and in favor of Takeda with respect to others.

9.      With respect to TWi, it was found to have infringed a single patent—U.S. Patent No. 7,737,282 (the "'282 patent")—which had an expiration date of June 15, 2020. Par and Impax were found to infringe other patents, with later expiration dates.

10.     TWi had strong arguments for affirming its trial wins and reversing its sole loss on the '282 patent at the Court of Appeals for the Federal Circuit. As explained below, one of the judges on the Federal Circuit panel expressed the view during oral argument held in March of 2015 that Judge Spero had committed reversible error by finding that the '282 patent was valid and not anticipated or made obvious by prior art.

11.     Even assuming the trial court rulings were affirmed, TWi was still on a path to enter the market in June of 2020, when the '282 patent was set to expire. TWi's entry would have occurred before entry by Par and Impax, which continued to face additional patent obstacles from the trial rulings.

12.     On April 27, 2015, a few weeks after the oral argument before the Federal Circuit, but before the appeals were decided, Takeda and TWi settled.

13.     Rather than compete, Takeda and TWi entered a reverse-payment settlement to unlawfully prolong Takeda's monopoly and to grant TWi a temporary monopoly over the sale of generic Dexilant.

14.     Specifically, on or around April 27, 2015, Takeda and TWi reached an anticompetitive agreement in which TWi agreed to delay launching a generic version of Takeda's Dexilant product until January of 2022, approximately 18 months after the expiration date of the single patent blocking TWi from entering the market. To compensate TWi for its agreement to forgo competing with branded Dexilant, Takeda paid off TWi in at least two ways.

15.     First, Takeda paid TWi $9.5 million in cash.

16.     Second, Takeda gave TWi the option to launch either an authorized generic ("AG") version of Dexilant or its own ANDA product, knowing that TWi would choose the former because

**CLASS ACTION COMPLAINT**

011037-11/3200678 V1

doing so would ensure that only one generic version of the drug came to market rather than two. In effect, Takeda granted TWi a monopoly on generic sales of the drug and agreed not to compete with TWi when TWi was finally permitted to enter the market in 2022.

17.    In accordance with their unlawful agreement, TWi waited until January 2022 to begin selling the AG Dexilant product, and as agreed, TWi had the generic market to itself for nearly a year.

18.    The deal was a win-win for Defendants. Takeda benefited by prolonging its monopoly until 2022, which allowed it to avoid generic competition and charge supracompetitive prices for branded Dexilant during that time. TWi benefited because, when it did eventually enter the market, it was able to sell generic Dexilant without competition from other generic manufacturers for nearly a year.

19.    Conversely, the agreement was a lose-lose for Plaintiff and members of the End-Payor Class who were (i) overcharged for dexlansoprazole because they were forced to buy branded Dexilant instead of a cheaper, generic product that would have otherwise been available by mid-2020; and (ii) overcharged on their purchases of generic Dexilant because (a) generic entry was delayed and (b) TWi was granted a monopoly when it belatedly entered the market for generic Dexilant in January 2022.

20.    The foregoing scheme was consistent with a broader effort by Takeda during this time period to unlawfully thwart generic competition against its branded products. For example, approximately seven months before Defendants entered into their reverse-payment agreement, Takeda entered an agreement with Par concerning a different Takeda drug called Amitiza. The Amitiza agreement is alleged to contain similar pay-for-delay terms that have been challenged in a separate ongoing lawsuit, and the court there has ruled that the agreement's terms plausibly establish a claim for an antitrust violation. In addition, within a year of Defendants' conspiracy here, Takeda was at it again, this time allegedly orchestrating agreements with multiple generic manufacturers to inhibit competition with its branded drug Colcrys. The Colcrys agreements also resulted in antitrust litigation, which, after Takeda's motions to dismiss and summary judgment were denied in part, Takeda settled during trial.

**CLASS ACTION COMPLAINT**

21.    This action seeks overcharge damages and related relief to redress Takeda's and TWi's unlawful conduct, which prevented free and fair competition and caused Plaintiff and members of the End-Payor Class to pay substantial overcharges on both branded and generic Dexilant.

## II.    PARTIES

22.    Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("Plaintiff") is a health and welfare benefits plan headquartered and with a principal place of business in Pennsauken, New Jersey. Plaintiff provides health and welfare benefits to members and participants who reside in numerous locations throughout the United States. Plaintiff purchased and/or provided reimbursement for some or all of the purchase price of Dexilant other than for resale in Delaware, New Jersey, Pennsylvania, and Virginia at supracompetitive prices during the class period and has thereby been injured. In addition, there is a high probability that Plaintiff will continue to purchase and/or provide reimbursement for Dexilant in the future. Plaintiff has purchased and/or intends to purchase generic dexlansoprazole, other than for resale. Plaintiff paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize prices for Dexilant.

23.    Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan. Takeda Japan owns and controls Defendants Takeda Pharmaceuticals U.S.A., Inc., ("Takeda U.S.A.) and Takeda Pharmaceuticals America, Inc. ("Takeda America"). Defendants Takeda Japan, Takeda U.S.A. and Takeda America were all parties to the unlawful settlement agreement with TWi.

24.    Takeda U.S.A. and Takeda America's current principal place of business is at 500 Kendall Street, Cambridge, Massachusetts 02142. Takeda also has U.S. operations near Chicago, Illinois.

25.    Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F, No. 41, Ln. 221, Gangqian Rd., Neihu Dist., Taipei City 114, Taiwan (R.O.C.). TWi Pharmaceuticals owns and controls Defendant TWi

**CLASS ACTION COMPLAINT**

Pharmaceuticals USA, Inc. ("TWi USA"), with a principal place of business at 115 West Century Road, Suite 135, Paramus, NJ 07652. Defendants TWi Pharmaceuticals and TWi USA are collectively referred to herein as "TWi."

### III.    JURISDICTION, VENUE, AND COMMERCE

26.    This action arises under Section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, and the State laws cited herein.

27.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

28.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims.

29.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because, during the relevant period, Defendants were found and transacted business in this District, and a substantial portion of the events and omissions underlying this action occurred in this District.

30.    During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

31.    The drugs at issue in this case are sold in interstate commerce, and Defendants' conduct, as described in this Complaint, occurred in, and had a substantial effect on, interstate commerce.

32.    Defendants' conduct also had a substantial effect on the intrastate commerce of each of the United States and the District of Columbia.

33.    This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

**CLASS ACTION COMPLAINT**

#### IV.    ECONOMIC AND REGULATORY BACKGROUND

**A.    Characteristics of the Prescription Pharmaceutical Marketplace**

34.    The marketplace for the sale of prescription pharmaceutical products in the United States is unusual. In most industries, the person who pays for a product is also the person who chooses the product. When the same person has both the payment obligation and the choice of products, the price of the product plays a predominant role in the person's choice of products. Consequently, manufacturers have a strong incentive to lower the price of their products to maintain profitability.

35.    The pharmaceutical marketplace, in contrast, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing certain drugs to patients unless they can present a prescription written by their physician. This prohibition introduces an anomaly into the pharmaceutical marketplace between the payment obligation and the product selection. The patient (or his or her insurer) has the obligation to pay for the pharmaceutical product, but his or her doctor chooses which product the patient will buy.

36.    In 1984, Congress sought to ameliorate the "disconnect," by authorizing the manufacture and sale of generic pharmaceuticals under the Drug Price Competition and Patent Term Restoration Act, known as the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et. seq.*, discussed further below. Now, when a pharmacist receives a prescription for a branded drug and an AB-rated generic version of that drug is available—AB-rated generic versions of brand name drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective as their brand name counterparts— state laws require the pharmacist to dispense the generic instead of the brand. Every state either requires or allows for a prescription written for the brand drug be filled with an AB-rated generic unless there are "Dispense as Written" instructions to the contrary.

37.    In this way, price is reintroduced to the product selection decision at the pharmacy counter, and the pharmaceutical marketplace "disconnect" is lessened. When an AB-rated generic equivalent is introduced and not prevented from competing, brand manufacturers can no longer exploit the "disconnect," their monopoly power dissipates, and some of the normal competitive

**CLASS ACTION COMPLAINT**

pressures are restored.

38.     Because AB-rated generic versions of brand-name drugs contain the same active ingredients and are determined by the FDA to be just as safe and effective as their branded counterparts, the only material differences between generic drugs and their branded counterparts are their prices and manufacturers. Because AB-rated generic versions of branded products are commodities that cannot otherwise be differentiated, the primary basis for generic competition is price.

39.     Typically, when there are multiple generic competitors on the market for a given brand, the generics are 50% to 80% (or more) less expensive than their branded counterpart. Consequently, the launch of an AB-rated generic drug usually results in significant cost savings for all drug purchasers.

40.     The combination of these factors—the regulatory interchangeability of AB-rated generics for the brand, state substitution laws, and margin incentives of pharmacies—results in the typical phenomenon that once a brand drug "goes generic," the product moves from a monopoly priced to a commodity priced item.

41.     Generic competition enables all members of the End-Payor Class to purchase generic versions of the drug at substantially lower prices and to purchase the brand drug at a reduced price.

42.     The Hatch-Waxman Act has significantly advanced the rate of generic drug launches. In 1983, before the Hatch-Waxman Act, only 35% of the top-selling branded drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, annual prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total annual prescription drug revenue had soared to $300 billion.

43.     The Federal Trade Commission ("FTC") estimates that about one year after market entry, a generic drug takes over 90% of the branded drug's unit sales at 15% of the price of the branded drug.[1] As a result, brand manufacturers view competition from generics as a grave threat

---

[1] FTC Staff Study, "Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions," (Jan. 2010).

**CLASS ACTION COMPLAINT**

to their bottom lines.

44.    When a branded drug faces generic drug competition, purchasers are able to (a) purchase generic versions of the drug at much lower prices, and/or (b) purchase the branded drug at a reduced price. Until the generic version of a branded drug enters the market, however, there is no bioequivalent generic to substitute for, and compete with, the branded drug, so the brand manufacturer can continue to profitably charge supracompetitive prices. As a result, brand manufacturers, well aware of the significant erosion of branded drug sales by generics, have a strong incentive to delay the start of generic drug competition. Brand manufacturers often seek to extend their monopolies by any means possible, sometimes even resorting to illegal ones.

**B.    New Brand Name Drugs**

45.    Under the FDCA, manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b).

46.    After the FDA approves a brand manufacturer's NDA, the manufacturer of the drug product must submit its drug patent to be published in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book." 21 U.S.C. §§ 355(b)(1) & (c)(2). The Orange Book is the FDA's official source for listing prescription (and nonprescription) drug products approved in an application under Section 505 of the Federal Food, Drug, and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 301, *et seq.*, related patent and exclusivity information, and other important information including therapeutic equivalence.

47.    The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed in the Orange Book, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

**C.    The Hatch-Waxman Amendments Streamline Generic Entry**

48.    The Hatch-Waxman Amendments simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. A

-8-

**CLASS ACTION COMPLAINT**

manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. The FDA assigns an AB-rating to a generic drug in capsule or tablet form that is therapeutically equivalent to its brand-name counterpart.

49.    The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart. 21 U.S.C. § 355(j)(8)(B).

50.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications: (i) that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification"); (ii) that the patent for the brand drug has expired (a "Paragraph II certification"); (iii) that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or (iv) that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

51.    If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph

IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product by granting final approval. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay or the expiration of a first filer's exclusivity.

52.    As an incentive to spur manufacturers to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification typically gets a period of protection from competition from other ANDA filers seeking approval to market generic versions of the same drug. For Paragraph IV certifications made after December 2003, the first generic applicant receives 180 days of market exclusivity vis-à-vis other ANDA filers. Generic drugs are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, but this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors in the market. Being able to sell without competition at a higher price for six months or more may be worth hundreds of millions of dollars.

53.    Brand manufacturers can "game the system" by listing patents in the Orange Book (even if such patents are not eligible for listing) and suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the competitor's product does not actually infringe the listed patents) in order to delay final FDA approval of an ANDA for up to 30 months. That brand manufacturers often sue generic manufacturers under Hatch-Waxman simply to delay generic competition—as opposed to enforcing a valid patent that is actually infringed by the generic—is demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation in cases involving 73% of the drug products studied.[2]

54.    On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") in order to make it more difficult for brand

---

[2] FTC, "Generic Drug Entry Prior to Patent Expiration: An FTC Study" (July 2002).

**CLASS ACTION COMPLAINT**

011037-11/3200678 V1

and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity. The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products. For example, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA, unless the failure is caused by a change in or review of the approval requirements. Forfeiture under the MMA most commonly occurs for failure to obtain tentative approval within the requisite 30 months.

55.    Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that qualified the first applicant for exclusivity (i.e., as to each patent for which the first applicant submitted a Paragraph IV certification), at least one of the following has occurred: (i) a final decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the patent from the Orange Book.

**D.    The Benefits of Generic Drugs**

56.    Generic versions of brand name drugs contain the same active ingredient and are determined by the FDA to be just as safe and effective, as their brand name counterparts. The only material difference between generic and brand name drugs is their price. The launch of a generic drug usually brings huge cost savings for all drug purchasers. As stated above, the Federal Trade Commission estimates that about one year after market entry, the generic version typically takes over 90% of the brand's unit sales and sells for as little as 15% of the price of the brand name product.

57.    Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for

-11-

prescriptions of branded drugs (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

58.     There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug. Health insurers and patients also benefit from the lower prices that result from generic competition.

59.     Generic competition enables Plaintiff and members of the End-Payor Class to purchase generic versions of the drug at substantially lower prices.

60.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices without losing substantial sales. As a result, brand manufacturers, who are well aware of generics' rapid erosion of their brand sales, have a strong incentive to delay the introduction of generic competition into the market, including through tactics such as those alleged here.

61.     Experience and economic research show that the first generic manufacturer to market its product typically prices it below the prices of its brand counterpart. Every state requires or permits that a prescription written for the brand be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

62.     During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market (though the brand's AG can be, and often is, on the market during the 180-day exclusivity period), and a first-filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

63.     Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other on price, driving prices down toward the marginal manufacturing costs

64.     According to the FDA and the FTC, the greatest price reductions are experienced

**CLASS ACTION COMPLAINT**

when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price. In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.

### E.    Pharmaceutical Manufacturers Game the Regulatory Structure in Order to Impair Competition

65.    When they do not face generic competition, brand manufacturers can usually sell the branded drug far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins is what economists call market power. When generics enter the market, however, they quickly take 80% or more of the unit sales. And when multiple generics are in the market, the competition between generics eventually drives their prices to near the marginal cost of production. This competition puts an end to the brand manufacturer's market power and delivers enormous savings to drug purchasers.

66.    Brand and first-filer generic manufacturers have a collective interest in delaying this competition. If they work together to prevent or delay competition, they can keep the profit margins on all unit sales at 70% and split the resulting excess profits among themselves. They can keep for themselves the enormous savings that competition would have delivered to drug purchasers.

67.    For such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide the purchaser savings between themselves. The generic manufacturer will not refrain from competing if it does not share in the ill-gotten gains through some means. Pay-offs from the brand manufacturer are the means by which brand and generic manufacturers divide between themselves the ill-gotten gains that delayed competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-delay" or "reverse payment" agreements.

68.    The brand manufacturer may choose to (unlawfully) pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its drug also prevents other generic manufacturers from marketing their products until at least six months after the first filer launches.

69.    In the past, reverse-payment agreements often took the form of a straight cash

-13-

**CLASS ACTION COMPLAINT**

payment from the brand name manufacturer to the generic competitor. As these payments attracted regulatory scrutiny, congressional investigations, and class action lawsuits, brand manufacturers and generic competitors have entered into increasingly elaborate agreements to mask the fundamentally anticompetitive character of their agreements. A common example of such an agreement is an agreement where the brand manufacturer agrees not to launch an authorized generic version of the brand drug.

**F.    Authorized Generics and Their Value**

70.    The 180-day marketing exclusivity to which first-filing generic manufacturers may be entitled vis-à-vis other ANDA filers does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day exclusivity period under its own approved New Drug Application. Such a generic is called an "authorized generic" and is identical to the brand drug, but is sold as a generic product, typically through a subsidiary of the brand manufacturer or through a third-party generic manufacturer. Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first filer's revenue and substantially reduces drug prices for consumers.

71.    In its study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact (August 2011), the Federal Trade Commission found that authorized generics capture a significant portion of sales and reduce the first filer generic's revenues by approximately 50% on average during the 180-day exclusivity period.

72.    Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, purchasers, such as Plaintiff and members of the End-Payor Class, benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

73.    As a practical matter, authorized generics are the only means by which brand- name manufacturers engage in price competition with manufacturers of AB-rated generic drugs. Brand-name manufacturers generally do not reduce the list price of their branded drugs in response to the entry of AB-rated generics. Instead, they either raise the price to extract higher prices from the small number of "brand-loyal" patients or, more typically, they continue to raise the price of the

-14-

**CLASS ACTION COMPLAINT**

branded drugs at the same intervals and the same rate at which they raised the price of the drugs prior to generic entry.

74.     Given the significant negative impact of an authorized generic on an ANDA filer's revenues, and the absence of any other form of price competition from the branded manufacturer, a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to a generic manufacturer. Brand manufacturers have used such agreements as a way to pay ANDA filers to delay entering the market. Such agreements deprive drug purchasers of the lower prices resulting from competition in two ways. During the initial period of delay agreed to by the ANDA filer, they effectively eliminate all competition from AB- rated generic products and allow the brand manufacturer to preserve its monopoly. And, during the period in which the branded company has agreed not to sell an authorized generic, they eliminate competition between the ANDA filer's generic and the authorized generic, giving the ANDA filer a monopoly on generic sales.

75.     As a means of compensating generic manufacturers, brand manufacturers prefer no-AG agreements to cash payments because, in the case of no-AG agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher generic drug prices. The generic manufacturer receives not only the sales and profits that the brand manufacturer would have made by launching an authorized generic in competition with the ANDA filer's product, it also profits from the higher prices that result from the absence of that competition. Thus, the "payment" to the generic manufacturer is shared between the brand manufacturer and the generic manufacturer's customers. *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 405 (3d Cir. 2015) ("The no-AG agreement transfers the profits the patentee would have made from its authorized generic to the settling generic—plus potentially more, in the form of higher prices, because there will now be a generic monopoly instead of a generic duopoly").

76.     Courts have held that no-authorized generic agreements are a form of reverse payment under Actavis and likely to be anticompetitive.

77.     No-AG agreements need not be explicit to achieve their anticompetitive ends. Any agreement that alters the economic incentives of branded companies and ANDA filers in such a

-15-

**CLASS ACTION COMPLAINT**

way as to give the ANDA filer a temporary monopoly over generic sales is effectively a no-AG agreement and will typically result in (i) a delay in generic entry and (ii) higher generic prices than would exist absent the agreement.

**G.    The Limits of Patent Protection for Drugs**

78.    The existence of one or more patents purporting to claim a drug substance or drug product does not by itself give a brand drug company an enforceable monopoly over the drug. Patents are routinely invalidated or held unenforceable, either upon reexamination, through inter partes review by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

79.    Under the framework set forth in the Hatch-Waxman Amendments, a generic drug company can challenge patents ostensibly covering the branded drug. A patent infringement lawsuit filed by the patent holder within 45 days after notification of the generic drug company's challenge of the patents will trigger a 30-month stay of regulatory approval, during which the FDA cannot approve the generic drug.

80.    At all times, a patent holder bears the burden of proving infringement.

81.    One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement. Another is to show that the patent is invalid or unenforceable.

82.    A patent is invalid or unenforceable when, e.g., (i) the disclosed invention is anticipated or obvious in light of earlier prior art, sale or use; (ii) when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) when a later-acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

83.    In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of: (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, (ii) whether a reasonable manufacturer in

the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit, or (iii) whether a patent may be "reasonably asserted" against a competitor or otherwise properly listed in the Orange Book.

84.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002. An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.

85.    If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

## V.    ANTICOMPETITIVE CONDUCT

### A.    Takeda's Development and Sale of Dexilant

86.    Defendant Takeda Pharmaceuticals U.S.A., Inc. is the registered holder of approved New Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

87.    Dexlansoprazole—marketed by Takeda under the trade name Dexilant—is a proton pump inhibitor ("PPI") used for the treatment of all grades of erosive esophagitis, maintaining healing of esophagitis, and treating heartburn associated with symptomatic non-erosive gastroesophageal reflux disease ("GERD").

88.    Dexlansoprazole works through the reduction in acid in one's stomach by blocking the final step of stomach acid production. It is released in two stages, based on different acidity levels in the human intestine.

89.    The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

90.    Takeda originally marketed dexlansoprazole under the name Kapidex.

91.    In or around March 2010, Takeda began marketing Kapidex under the new name

-17-
**CLASS ACTION COMPLAINT**

Dexilant to avoid potential confusion with two other medications.

92.     Dexilant generated significant revenue and profits for Takeda. Dexilant sales grew from around $200 million annually in 2010 to over a billion dollars annually beginning in 2015 and nearly every year thereafter until generic dexlansoprazole came to the market in 2022.

**B.     Takeda's Patents, Orange Book Listings, and ANDA Filings by Generic Manufacturers**

93.     Due to the large market for Dexilant, it was not long before other pharmaceutical manufacturers began taking steps to launch generic versions of the drug.

94.     The path to market entry by these potential generic competitors was impacted by Takeda's patents directed at Dexilant, many of which Takeda listed in the FDA's Orange Book.

95.     Takeda owns and over time has listed numerous patents in the Orange Book that it alleged covered Dexilant.

96.     Takeda also owns and has asserted claims for infringement on patent claims it alleges were infringed by generic Dexilant ANDA products, but which claims were not in a patent listed in the Orange Book.

97.     Takeda's asserted patents relating to Dexilant (including those listed in the Orange Book for NDA 22-287), along with their titles and expiration dates, are as follows:

| U.S. Pat. No. | Title | Exp. Date | Listed in Orange Book |
|---|---|---|---|
| 7,737,282 ('282 patent") | Benzimidazole Compound Crystal | 6/15/2020 | No |
| 6,462,058 ('058 patent") | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H- benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent. | 6/15/2020 | Yes |
| 6,939,971 ('971 patent") | Benzimidazole Compound Crystal | 6/15/2020 | Yes |
| 7,285,668 ('668 patent") | Process for the Crystallization of (R)– or (S)-Lansoprazole | 6/15/2020 | Yes |
| 9,145,389 ('389 patent") | Benzimidazole Compound Crystal | 6/15/2020 | Yes |

-18-

**CLASS ACTION COMPLAINT**

| U.S. Pat. No. | Title | Exp. Date | Listed in Orange Book |
|---|---|---|---|
| **6,664,276** ('276 patent") | Benzimidazole Compound Crystal | 1/30/2023 | Yes |
| **8,722,084** ('084 patent") | Controlled Release Preparation | 10/15/2023 | Yes |
| **8,784,885** ('885 patent") | Controlled Release Preparation | 10/15/2023 | Yes |
| **8,461,187** ('187 patent") | Multi PPI Dosage Form | 1/17/2026 | Yes |
| **9,238,029** ('029 patent") | Multi PPI Dosage Form | 1/17/2026 | Yes |
| **9,011,926** ('926 patent") | Method for Producing Granules | 2/24/2026 | Yes |
| **7,790,755** ('755 patent") | Controlled Release Preparation | 8/02/2026 | Yes |
| **8,105,626** ('626 patent") | Granules Containing Acid- Unstable hemical In Large Amount | 9/27/2026 | Yes |
| **8,871,273** ('273 patent") | Method for Producing Granules | 1/11/2028 | Yes |
| **8,173,158** ('158 patent") | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 3/17/2030 | Yes |
| **9,233,103** ('103 patent") | Methods for Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 3/05/2032 | Yes |

98.    Due to Takeda's listing of patents in the Orange Book for Dexilant, when potential generic competitors filed ANDAs for their generic Dexilant product, they were required to certify against any patents that were listed at that time.

99.    The first pharmaceutical company to file an ANDA and certify against Takeda's then-listed patents for the 60 mg generic dexlansoprazole product was Handa Pharmaceuticals, LLC ("Handa"). Handa's ANDA was filed on August 25, 2010, with a Paragraph IV certification to Takeda's then listed patents. Handa subsequently transferred its ANDA to Par Pharmaceutical Companies Inc. ("Par") in April 2012.

100.    The first pharmaceutical company to file an ANDA and certify against Takeda's then listed patents for the 30 mg generic dexlansoprazole product was Impax Laboratories, Inc. ("Impax"). Impax's ANDA was filed on November 30, 2010, with a Paragraph IV certification to

-19-

1    Takeda's then listed patents.

2        101.    Generic manufacturer Anchen Pharmaceuticals, Inc. filed ANDAs for 30 mg and 60

3    mg generic dexlansoprazole, which it transferred to Defendant TWi in May 2011. As with first

4    filers Par and Impax, TWi filed Paragraph IV certifications to one or more of the Takeda patents

5    then listed in the Orange Book.

6        102.    Other generic manufacturers similarly filed ANDAs for 30 and/or 60 mg

7    dexlansoprazole that included Paragraph IV certifications.

8    **C.    Takeda's Infringement Suits Against Generic Manufacturers and 2013 Trial Rulings**

9        103.    The ANDA filings for generic dexlansoprazole and their accompanying Paragraph

10   IV certifications resulted in Takeda filing numerous patent infringement lawsuits against TWi, Par,

11   Impax, and others.

12       104.    The first (and only) trial of Takeda's various Dexilant lawsuits took place in June

13   2013 in the Northern District of California before United States Magistrate Judge Spero.

14       105.    The trial consolidated Takeda's then-pending actions and claims against TWi, Par

15   and Impax. The issues in the trial were whether each ANDA infringed various claims of

16   the '282, '755, '058, '276, '971 and '668 patents, the sufficiency of the disclosures in the patents,

17   and whether the patents were anticipated or obvious in view of the prior art. The court's claim

18   construction ruling narrowed some infringement claims and subsequently, at summary judgment,

19   the court resolved additional infringement claims for each ANDA holder and certain validity

20   questions on the asserted patents.

21       106.    As to TWi, Takeda conceded that TWi's ANDA did not infringe four patents

22   (the '058, '276, '971 and '668 patents), and the court entered final judgment in TWi's favor with

23   respect to those patents. At summary judgment, the court found that TWi's ANDA did not infringe

24   the '755 Patent. However, the court granted Takeda's summary judgment motion that TWi's

25   ANDA did infringe claims 1 and 2 of the '282 Patent. The court also denied TWi's motion on the

26   invalidity of the '282 Patent based on grounds of anticipation.

27       107.    As to Par, the court found at summary judgment that Par's ANDA did not infringe

28   the '755 Patent. However, the court denied Par's summary judgment motion of non-infringement

**CLASS ACTION COMPLAINT**

of the '276 Patent, finding triable issues of fact remained as to infringement of that patent. It also denied Par's summary judgment motion on invalidity of the '282 Patent based on grounds of anticipation and granted Takeda's motion for summary judgment holding that the Par ANDA infringed the '282 Patent.

108.    As to Impax, the court found at summary judgment that Impax's ANDA did not infringe the '755 Patent. However, the court granted Takeda's summary judgment motion that '058, '276, and '971 Patents were infringed by Impax's proposed product. The court rejected Impax's claims that '971 Patent lacked adequate written description to support the asserted claims and denied Impax's cross motion of non-infringement of the '971 Patent.

109.    Following a weeklong trial, on October 17, 2013, the district court issued Findings of Fact and Conclusions of Law, finding that (a) Par's product infringed the '276 Patent; (b) the '276, '058 and '971 Patents were not obvious in view of the prior art; (c) the '282 Patent was not anticipated or obvious in view of the prior art, and did not lack sufficient written description; (d) the Takeda entities had standing to assert the '282 Patent against TWi; and (e) Takeda could not assert the DJA against TWi for infringement of the '282 Patent under § 271(a).

110.    At the trial, TWi had presented evidence that the '282 Patent was invalid based on anticipation in the prior art or obviousness:

> Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to solid compounds. There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. E.g., *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids. (A1985; A1989.) Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically" refers to solids. (Red Bf. 18–19.) That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. E.g., *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).
>
> Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity. But on appeal, in an attempt to deflect from its patent's written description problems, Takeda has conceded that

"it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the Court's claim construction) based on the disclosure in Barberich." (Red Bf. 27.) That disposes of Takeda's ability to argue nonenablement of Barberich. Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich. Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference. However, any procedure available in the prior art is sufficient. E.g., *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003). Moreover, the law embraces adaptations within the skill in the art. E.g., *In re Lambert*i, 545 F.2d 747, 750 n.2 (CCPA 1976).

111.    The court's final judgments in each case prevented TWi from obtaining approval of its ANDA until the expiration of the '282 Patent on June 15, 2020. Impax and Par, also delayed by the '282 Patent, were further prevented from obtaining approval until December 20, 2020 (for Impax, after the expiration of the '058, '276, and '971 Patents; and for Par, after the expiration of the '276 Patent), subject to further patent term extensions for those patents under review at the Patent Office.

112.    The upshot of these rulings was that absent a reversal on appeal, the earliest TWi could come to market was upon expiration of the '282 Patent on June 15, 2020, and Par and Impax were blocked until at least December 20, 2020. TWi effectively leapfrogged Par and Impax in its ability to come to market, as they had now lost their first filer status with their losses at trial.

113.    Takeda recognized TWi's advantageous position compared to other generic manufacturers due to the trial rulings, stating in a post-trial press statement: "Based on the ruling, Takeda expects the first generic entry no earlier than June 2020."

**D.    Takeda Resolves Each of Its Dexilant Patent Cases After the Initial Trial**

114.    Following the trial rulings, Par, TWi, and Impax all appealed the adverse aspects of the district court's decision to the Court of Appeals for the Federal Circuit. Takeda also cross-appealed the district court's determination that Par, TWi, nor Impax infringed the '755 patent.

115.    TWi presented a strong appeal challenging the validity of the '282 patent, which was the only patent the district court found TWi had infringed.

116.    At oral argument before the Court of Appeals on March 6, 2015, TWi's arguments about anticipation or obviousness appeared to find favor with the appellate panel. One of the judges

**CLASS ACTION COMPLAINT**

raised the issue of whether Judge Spero's failure to consider the evidence on this topic was "clearly erroneous" and inconsistent with the evidence.

117.    Conversely, Takeda presented a weak appeal challenging the district court's determination that none of the defendants infringed the '755 patent. The claim language is unambiguous, and Takeda itself initially advocated for the claim construction adopted and applied by the district court.

118.    All parties settled before the Court of Appeals for the Federal Circuit issued a ruling.

119.    Takeda settled with Par on or around July 18, 2014, and with Impax on or around October 16, 2014.

120.    Takeda's settlement with TWi took longer. But approximately seven weeks after oral argument before the Court of Appeals for the Federal Circuit, Takeda, recognizing that its arguments regarding the '282 Patent were being questioned skeptically by the judges, settled with TWi on or around April 27, 2015.

121.    By the end of 2015, Takeda had settled its ongoing infringement actions against all generic manufacturers whom it had sued with respect to ANDAs for Dexilant.

**E.    Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda**

122.    Takeda's agreement with TWi to resolve their ongoing patent disputes regarding Dexilant was a "reverse payment" agreement in violation of the antitrust laws.

123.    At the time of settlement in 2015, the only serious obstacle to entry that TWi faced was the '282 patent, which was set to expire on June 15, 2020.

124.    TWi had very strong arguments for a reversal of the trial court's ruling with respect to the '282 patent based on invalidity because prior art anticipated or rendered obvious the asserted claims in the patent. More specifically, TWi presented strong arguments that the district court had misconstrued the claim term "amorphous compound" by limiting it to solids and that, as properly construed, the claims were anticipated by prior art. TWi also presented strong arguments that even under the district court's claim construction, the claims were invalid for lack of written description and/or because the claims were anticipated or would have been obvious by prior art.

**CLASS ACTION COMPLAINT**

125.    Despite its strong appellate position, and the June 15, 2020 expiration date of the relevant patent, TWi agreed to delay entry of its generic Dexilant product until January 2022.

126.    TWi agreed to this delay because Takeda agreed to provide a large and unjustified payment to TWi in return for the delay.

127.    First, Takeda paid TWi $9.5 million as part of the agreement.

128.    TWi expressly acknowledged receipt of the payment in an investor report stating: "[For Dexlansoprazole DR Capsule, Twi] … reached a patent litigation settlement agreement with Takeda Pharmaceutical Company Ltd. and signed an authorization and supply contract. **Takeda also paid the company a settlement of US$9.5 million**." (machine translated into English; emphasis added).

129.    This payment far exceeded any reasonable estimate of Takeda's saved future litigation expenses. By the time of the payment, the core claims had already been tried before the district court and fully briefed and argued to the appellate court. Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later filed case had been considerably narrowed through an order resolving cross motions for summary judgment.

130.    Second, and entirely apart from the $9.5 million cash payment, Takeda paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant—the economic equivalent of a no-AG agreement.

131.    Under the terms of the parties' deal, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming it received FDA approval).

132.    Given a choice between launching an AG and launching its own ANDA product, a generic manufacturer will almost always find it more profitable to launch the AG and forgo launching the ANDA product, particularly if entry by other ANDA filers is unlikely for some significant period of time. If the generic chooses to launch its ANDA product, the brand company will typically find it profitable to launch an AG in order to capture some portion of the sales that would otherwise go to the ANDA filer, splitting those sales and lowering generic prices. The

**CLASS ACTION COMPLAINT**

generic manufacturer will almost always earn higher profits if there is a generic monopoly rather than a duopoly, even if it is required by the terms of the agreement to share those monopoly profits with the branded company.

133.    Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to launch the Dexilant AG.

134.    By giving TWi the option to launch an AG for Takeda, it effectively gave TWi the option to be the exclusive seller of generic Dexilant for some period of time. This promise was extremely valuable to TWi and induced TWi to accept a later entry date.

135.    TWi's press release shortly after the settlement summarizes its AG rights in part as follows: "As part of the settlement, the parties also entered into a License and Supply Agreement allowing TWi and its affiliates to sell Dexilant® in both dosage strengths as the Authorized Generic … Furthermore, the license and supply of the Authorized Generic from Takeda allows TWi to be the supplier of both strengths of a generic Dexilant® in the U.S. market for a period of time, which provides significant sales and marketing advantage as well as furthering TWi's goal bringing affordable healthcare to patients." (emphasis added).

136.    TWi's use of the definite article "the" in this press release confirms that Takeda did not retain the right to launch a second "AG" if TWi chose to exercise its option to launch the AG rather than the ANDA product.

137.    TWi's references to an agreed period of time where it would have a "significant sales and marketing advantage" is also important. If Takeda retained the right to launch a second AG in competition with the AG launched by TWi, there would be no need to refer to a "period" during which TWi would enjoy a monopoly on generic sales and TWi would have no "significant sales and marketing advantage" during such time period.

138.    As promised, TWi chose not to enter the market on June 15, 2020, when the '282 patent expired. Instead, TWi waited until on or around January 1, 2022, at which point it exercised its option to launch an AG product pursuant to its agreement with Takeda. And, as the parties anticipated, the AG launched by TWi was the only generic form of Dexilant on the market for

**CLASS ACTION COMPLAINT**

nearly a year, until November 22, 2022.

139.  Both Takeda and TWi benefitted by avoiding fair and legal competition.

140.  Takeda benefited because it avoided AB-rated generic competition from TWi and was the sole seller of Dexilant in either branded or generic form from June 15, 2020 until January 1, 2022. Takeda also likely received some portion of the supracompetitive profits earned by TWi during the period when TWi was the only seller of generic Dexilant on the market.

141.  This unlawful extension of Takeda's monopoly allowed Takeda to continue charging monopoly prices longer than would have otherwise been possible.

142.  Sales of the AG product sold by TWi were more than $328 million in 2022 alone. Had Takeda launched an AG to compete with TWi's ANDA product, the AG would have captured a large share of those sales.

143.  By giving TWi the option to launch the AG rather than Takeda, Takeda effectively gave up at least a portion of the sales it would have made by launching an AG—a large transfer of value from Takeda to TWi. See King Drug, 791 F.3d at 405.

144.  TWi benefited by enjoying a monopoly on sales of generic Dexilant from January 2022 through November 2022. The ability to charge monopoly prices for generic Dexilant starting in January 2022, along with the $9.5 million payment from Takeda, more than compensated TWi for delaying its entry into the market.

145.  The terms of Defendants' agreement were not publicly disclosed, but any payment of royalties back to Takeda by TWi required by the agreement would not alter the antitrust analysis. Royalties are simply a means by which the settling generic shares with the brand company the supracompetitive profits earned by the generic as a result of its generic monopoly.

F.  **Takeda Entered into Other Alleged Improper Agreements with Competitors During this Same Time Period**

146.  Takeda had a practice of engaging in suspect agreements with competitors during this period of time.

147.  Approximately seven months prior to the Defendants' agreement concerning Dexilant, Takeda entered into an agreement with generic competitor Par concerning a different

-26-

011037-11/3200678 V1

Takeda drug called Amitiza.

148.    As with Defendants' agreement here, the Amitiza agreement is alleged to have been designed to delay and suppress generic competition. Specifically, Par agreed to delay the launch of its generic Amitiza product in exchange for an implicit no-AG commitment from Takeda.

149.    Several antitrust lawsuits have been filed, and the court overseeing the case has denied a motion to dismiss by Takeda, holding that the complaints in that case plausibly stated a claim of an antitrust violation.

150.    A little over a year after the Amitiza agreement, and within a year of Defendants' agreement here, Takeda entered into more agreements with competitors, this time concerning Takeda's drug Colcrys.

151.    According to the plaintiffs in yet another antitrust case against Takeda, Takeda agreed with generic competitors to allocate the market for Colcrys.

152.    In particular, under the Colcrys agreement, generic competitors allegedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date.

153.    The plaintiffs in the Colcrys matter defeated a motion to dismiss and summary judgment, and Takeda ultimately settled at trial before a verdict was rendered.

**G.    In the Absence of Defendants' Agreement, Two Competing Generics Would Have Been Available, at a Much Lower Price Point, by Approximately June 15, 2020 or Earlier**

154.    In the absence of Defendants' unlawful Agreement, at least two generics would have been available no later than June 15, 2020, when the '282 patent expired, instead of merely branded Dexilant.

155.    Specifically, absent the unlawful agreement, TWi would have launched its ANDA product under its own ANDA on or about June 15, 2020. In response, Takeda would have sold an AG to compete with TWi's product to capture some portion of the generic market.

156.    First, TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would have occurred earlier but for Defendants' unlawful Agreement. FDA has a practice of focusing its limited resources on approval of products whose launches are imminent. TWi's agreement to delay its

-27-

launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

157.    Second, there were no first filer exclusivities standing in the way of TWi. The exclusivity of the first filers—Par on the 60 mg product and Impax on the 30 mg product—were forfeited due to their delays in getting their products tentatively approved and/or the findings of non-infringement at trial as to TWi on patents that were blocking the first filers.

158.    Third, Takeda's patents would not have delayed TWi's entry date. Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi, and TWi prevailed on all but the '282 patent, which expired in June 2020, at the trial. While Takeda sued TWi on two other patents—the '187 and '158 patent—in a separate lawsuit, had the parties not settled, TWi would have prevailed. Among other reasons, these patents were plainly invalid due to prior art. Takeda's remaining patents purportedly covering Dexilant would have been easy for TWi to either design around or carve out or been subject to noninfringement or invalidity defenses similar to those TWi advanced against the '187 and '158 patents. Indeed, Takeda itself recognized, before its unlawful agreement with TWi, that generic entry was likely in June of 2020: "Based on the ruling, Takeda expects the first generic entry no earlier than June 2020."

159.    The effects of Defendants' antitrust violations are ongoing. When generic entry is delayed, pharmaceutical markets do not instantaneously reach the equilibrium that would have existed if generic entry had occurred significantly earlier. First, it takes time for generic substitution rates to reach their maximum rate (typically 80-90%). In the interim, drug purchasers are necessarily buying more units of the branded drug than they would have if generic entry had occurred earlier. Second, since generic drugs are priced at a discount from the price of branded drug at the time of generic entry, and since the price of branded drugs generally goes up over time, a delay in generic entry will typically result in higher generic prices post-entry. This elevation in generic prices can occur even in the presence of robust generic competition. If the antitrust violation itself includes an unlawful restraint on generic competition, as in this case, the price effect is worse.

**CLASS ACTION COMPLAINT**

## VI.    MARKET POWER AND RELEVANT MARKET

160.    Before January 1, 2022, Takeda had monopoly power in the market for Dexilant because it had the power to maintain the price of dexlansoprazole at supracompetitive levels without losing enough sales to make those supracompetitive prices unprofitable. From January 1, 2022 through at least November 22, 2022, TWi had monopoly power in the sale of generic Dexilant because it had the power to maintain the price of generic dexlansoprazole at supracompetitive levels without losing enough sales to make those supracompetitive prices unprofitable.

161.    Before January 1, 2022, a small but significant, non-transitory increase to the price of brand Dexilant would not have caused a loss of sales sufficient to make the price increase non-profitable. From January 1, 2022, through November 22, 2022, a small but significant, non-transitory increase in the price of generic Dexilant would not have caused a loss of sales sufficient to make the price increase non-profitable.

162.    Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Dexilant.

163.    Dexilant is differentiated from all other drugs other than the AB-rated generic versions of Dexilant.

164.    Takeda needed to control only branded Dexilant and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices.

165.    For several years, Takeda sold brand Dexilant at prices well in excess of its marginal cost and in excess of the competitive price, and therefore, Takeda had extremely high profit margins. During the period of its generic monopoly, TWi likewise earned high profit margins.

166.    Takeda had, and exercised, the power to exclude generic competition to branded Dexilant.

167.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Dexilant from the forces of price competition.

168.    There is direct evidence of market power available in this case sufficient to show Takeda's ability to control the price of brand Dexilant. There is likewise direct evidence of TWi's

**CLASS ACTION COMPLAINT**

ability to control the price of generic Dexilant starting in January 2022. That evidence includes, among other things, the ratio of the price of branded and generic Dexilant to their marginal cost; the margins earned by Takeda and TWi on the sale of those products; and the size and existence of the reverse payment from Takeda to TWi. As the Supreme Court recognized in Actavis, firms lacking market power are not likely to pay a competitor a large sum to avoid the risk of competition. 570 U.S. at 157.

169. To the extent proof of monopoly power by defining a relevant product market is required, the relevant antitrust product market is the market for Dexilant and its AB-rated generic equivalents, and the relevant geographic market is the United States.

170. Takeda's share of the relevant market was 100% until January 1, 2022.

171. Defendants' conspiracy had the purpose and effect of restraining competition in the relevant market, allowing Takeda to maintain and extend its monopoly over dexlansoprazole beyond June 2020, and allowing TWi to enjoy a monopoly over sales of generic Dexilant from January 2022 until November 22, 2022.

## VII.   ANTITRUST IMPACT

172. During the relevant time period, Plaintiff and members of the End-Payor Class purchased Dexilant and/or generic Dexilant from Defendants. As a result of Defendants' illegal conduct, the entry of a generic version of Dexilant was delayed and the price of generic Dexilant when it ultimately became available was higher than it would have been if the violation had not occurred. As a result, Plaintiff and members of the End-Payor Class paid artificially inflated prices for branded and generic Dexilant.

## VIII.   ACCRUAL AND FRAUDULENT CONCEALMENT

173. Under the accrual rule, sometimes referred to as the continuing violation doctrine, a separate cause of action accrued for Plaintiff and members of the End-Payor Class each time that they purchased a unit of branded or generic Dexilant at a price higher than the purchaser would have paid absent Defendants' antitrust violations. The applicable limitations period is four years. Accordingly, Plaintiff and members of the End-Payor Class are entitled to recover overcharges on all sales made to them within four years prior to the filing of this lawsuit.

**CLASS ACTION COMPLAINT**

174.    In addition, Defendants fraudulently concealed their antitrust violation, allowing Plaintiff and members of the End-Payor Class to recover overcharge damages even on purchases made more than four years prior to the filing of this Complaint.

175.    Defendants never publicly disclosed the material terms of their settlement agreement. TWi's press release announcing the settlement did not disclose that it received a $9.5 million payment from Takeda, nor did it reveal Takeda's agreement not to launch an AG. Moreover, Defendants' scheme, like most antitrust conspiracies, was self-concealing. Defendants employed deceptive tactics and techniques to avoid detection of, and to affirmatively conceal, their antitrust violations.

176.    It was not until TWi actually launched its AG product in January 2022 and was able to sell that product free of competition from other generic versions of Dexilant that the nature and terms of Defendants' conspiracy were revealed.

177.    Plaintiff had no actual knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence more than four years before the filing of this complaint. Plaintiff filed this lawsuit within four years of discovering the violation.

178.    As a result of Defendants' fraudulent concealment, the applicable statute of limitations governing Plaintiff's claims was tolled and Plaintiff and members of the End-Payor Class are entitled to recover all overcharges resulting from Defendants' antitrust violation without regard to when those overcharges were paid.

## IX.    CLASS ACTION ALLEGATIONS

179.    Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following End-Payor Class:

> All persons and entities who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of brand or generic Dexilant from as early as June 15, 2020 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

180.    The End-Payor Class as defined herein, includes a Multistate End-Payor Repealer Subclass, defined as follows:

**CLASS ACTION COMPLAINT**

All persons and entities in a Repealer State who indirectly purchased, paid, and/or provided reimbursement for some or all the purchase price of brand or generic Dexilant during the Class Period.

181. As used herein, Repealer State means any or all of the following: Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

182. As used herein, Class Period means the period from at least as early as June 15, 2020, through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased, but in any case no earlier than the present.

183. Excluded from the End-Payor Class are Defendants and each of their respective officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

184. Members of the End-Payor Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the End-Payor Class are readily identifiable.

185. Plaintiff's claims are typical of the claims of the members of End-Payor Class. Plaintiff and members of the End-Payor Class were damaged by the same conduct of Defendants.

186. Plaintiff will fairly and adequately protect and represent the interests of members of the End-Payor Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the End-Payor Class.

187. Plaintiff is represented by counsel with substantial experience and success in the prosecution and leadership of antitrust class actions and other complex litigation, including antitrust class actions involving pharmaceutical products.

188. Questions of law and fact common to the members of the End-Payor Class predominate over questions that may affect only individual members of the End-Payor Class, thereby making damages with respect to members of the End-Payor Class as a whole appropriate.

**CLASS ACTION COMPLAINT**

189.    Questions of law and fact common to members of End-Payor Class include, but are not limited to:

a.    whether the conduct alleged herein constitutes a violation of the antitrust laws;

b.    whether Defendants conspired to suppress generic competition to Dexilant;

c.    whether Defendants' anticompetitive scheme suppressed generic competition to Dexilant;

d.    The type of injury suffered by Plaintiff and members of the End-Payor Class;

e.    The extent to which Defendants were unjustly enriched; and

f.    Aggregate damages suffered by Plaintiff and members of the End-Payor Class.

190.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

191.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

192.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## X.    CLAIMS FOR RELIEF

### COUNT I:

### VIOLATION OF 15 U.S.C. § 1
### (Against All Defendants For Injunctive Relief Only)

193.    Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

194.    From the launch of Dexilant in 2009, Takeda possessed monopoly power in the relevant market. From January to November 2022, TWi possessed monopoly power over the sale

**CLASS ACTION COMPLAINT**

of generic Dexilant in the United States.

195.    On or about April 27, 2015, Takeda and TWi entered into an unlawful reverse-payment agreement whereby Takeda made a large and unjustified payment to TWi in exchange for TWi's agreement to delay the sale of generic Dexilant. That payment included both cash and the grant of a generic monopoly to TWi for some period of time after its delayed entry. The purpose and effect of this Agreement were: (i) to delay the entry of generic Dexilant and allow Takeda to maintain and extend its monopoly in the relevant market, to the detriment of Plaintiff and members of the End-Payor Class; and (ii) to induce TWi to accept a later entry date by effectively granting TWi an eleven-month monopoly over the sale of generic Dexilant, also to the detriment of Plaintiff and members of the End-Payor Class.

196.    Defendants' unlawful agreement has had a substantially adverse effect on competition within the relevant market.

197.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on direct purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

198.    In the alternative, the agreement between Takeda and TWi was an illegal temporal horizontal market-allocation agreement, a per se violation of section one of the Sherman Act. TWi agreed not to compete with Takeda from June 15, 2020 until January 2022, and Takeda agreed not to compete with TWi from January 2022 forward.

199.    Plaintiff and members of the End-Payor Class have been injured in their business or property by Defendants' antitrust violation. That injury consists of paying higher prices for brand and generic Dexilant than would have been paid in the absence of Defendants' antitrust violations. Plaintiff and members of the End-Payor Class's injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

200.    Plaintiff and members of the End-Payor Class continue to pay higher prices today for dexlansoprazole than they would have paid in the absence of Defendants' antitrust violation and are threatened with future injury to their business and property by reason of Defendants' continuing

-34-

**CLASS ACTION COMPLAINT**

violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## COUNT II:

### VIOLATION OF 15 U.S.C. § 2
**(Against Takeda For Injunctive Relief Only)**

201.    Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

202.    Prior to 2022, Takeda possessed monopoly power in the relevant market.

203.    Takeda unlawfully maintained its monopoly power by entering into a reverse-payment agreement that included a large and unjustified payment to Twi in exchange for Twi's agreement to delay the launch of generic Dexilant. Specifically, Takeda paid Twi $9.5 million in cash and effectively granted Twi an eleven-month generic monopoly in exchange for Twi's agreement to delay its market entry until 2022.

204.    The goal, purpose, and effect of Takeda's unlawful conduct was to maintain and extend its monopoly power in the relevant market. The delay in the introduction of generic Dexilant that Takeda purchased allowed it to continue charging supracompetitive prices for the drug and earning supracompetitive profits. Because the payment to Twi included the grant of a monopoly on sales of generic Dexilant, Twi was able to maintain supracompetitive prices on generic Dexilant even after its belated entry into the market, creating further harm to the market and to Plaintiff and members of the End-Payor Class.

205.    The anticompetitive consequences of Takeda's actions far outweigh any arguable procompetitive benefits.

206.    Plaintiff and members of the End-Payor Class have been injured in their business or property by Takeda's antitrust violation. That injury consists of paying higher prices for branded and generic Dexilant than would have been paid in the absence of the antitrust violations. Plaintiff and members of the End-Payor Class's injury is of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

207.    Plaintiff and members of the End-Payor Class continue to pay higher prices today

**CLASS ACTION COMPLAINT**

011037-11/3200678 V1

for dexlansoprazole than they would have paid in the absence of Takeda's antitrust violation and are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**COUNT III:**

**COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE
UNDER STATE LAW
(Against All Defendants)**

208.    Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

209.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the End-Payor Class are entitled to relief under:

a.    Arizona, Ariz. Rev. Stat. § 44-1401, *et seq.*

b.    California, Cal. Bus. & Prof. Code § 16700, *et seq.*

c.    Colorado, Colo. Rev. Stat. §§ 6-4-101, *et seq.*

d.    Connecticut, Conn. Gen. Stat. § 35-24, *et seq.*

e.    D.C. Code § 28-4501, *et seq.*

f.    Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

g.    Hawaii, Hawaii Rev. Stat. § 480-1, *et seq.*

h.    Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*

i.    Iowa, Iowa Code § 553.1, *et seq.*

j.    Kansas, Kan. Stat. Ann. § 50-101, *et seq.*

k.    Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq.*

l.    Maryland, Md. Code, Comm. Law § 11-201, *et seq.*

m.    Michigan, MCL § 445.773, *et seq.*

n.    Minnesota, Minn. Stat. § 325D.49, *et seq.*

o.    Mississippi, Miss. Code Ann. § 75-21-1, *et seq.*

p.    Nebraska, Neb. Rev. Stat. § 59-801, *et seq.*

q.    Nevada, Nev. Rev. Stat. § 598A.010, *et seq.*

-36-

**CLASS ACTION COMPLAINT**

r.      New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, *et seq.*

s.      New Jersey, N.J. Stat. Ann. § 56:9-11, *et seq.*

t.      New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq.*

u.      New York, N.Y. Gen. Bus. Law § 340, *et seq.*

v.      North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

w.      North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq.*

x.      Oregon, Or. Rev. Stat. § 646.705, *et seq.*

y.      P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

z.      Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

aa.     South Carolina, S.C. Code Ann. § 39-3-10, *et seq.*

bb.     South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq.*

cc.     Tennessee, Tenn. Code Ann. § 47-25-101, *et seq.*

dd.     Utah, Utah Code. Ann. § 76-10-3101, *et seq.*

ee.     Vermont, 9 V.S.A. § 2453a(a)

ff.     West Virginia, W.V. Code § 47-18-1, *et seq.*

gg.     Wisconsin, Wisc. Stat. § 133.01, *et seq.*

hh.     Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq.*

## COUNT IV:

### MONOPOLIZATION UNDER STATE LAW
### (Against Takeda)

210.    Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

211.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the End-Payor Class are entitled to relief under:

a.      Arizona, Ariz. Rev. Stat. § 44-1401, *et seq.*

b.      California, Cal. Bus. & Prof. Code § 16700, *et seq.*

c.      Colorado, Colo. Rev. Stat. §§ 6-4-101, *et seq.*

d.      Connecticut, Conn. Gen. Stat. § 35-24, *et seq.*

-37-

**CLASS ACTION COMPLAINT**

1    e.    D.C. Code § 28-4501, *et seq.*

2    f.    Delaware Del. Code Ann. tit. 6, § 2101, et. seq.

3    g.    Hawaii, Hawaii Rev. Stat. § 480-1, *et seq.*

4    h.    Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*

5    i.    Iowa, Iowa Code § 553.1, *et seq.*

6    j.    Kansas, Kan. Stat. Ann. § 50-101, *et seq.*

7    k.    Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq.*

8    l.    Maryland, Md. Code, Comm. Law § 11-201, *et seq.*

9    m.    Michigan, MCL § 445.773, *et seq.*

10   n.    Minnesota, Minn. Stat. § 325D.49, *et seq.*

11   o.    Mississippi, Miss. Code Ann. § 75-21-1, *et seq.*

12   p.    Nebraska, Neb. Rev. Stat. § 59-801, *et seq.*

13   q.    Nevada, Nev. Rev. Stat. § 598A.010, *et seq.*

14   r.    New Hampshire, N.H. Rev. Stat. Ann. tit. XXXI, § 356:1, *et seq.*

15   s.    New Jersey, N.J. Stat. Ann. § 56:9-11, *et seq.*

16   t.    New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq.*

17   u.    New York, N.Y. Gen. Bus. Law § 340, *et seq.*

18   v.    North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

19   w.    North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq.*

20   x.    Oregon, Or. Rev. Stat. § 646.705, *et seq.*

21   y.    P.R. Laws Ann. tit. 10 §§ 258, *et seq.*

22   z.    Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

23   aa.   South Carolina, S.C. Code Ann. § 39-3-10, *et seq.*

24   bb.   South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq.*

25   cc.   Tennessee, Tenn. Code Ann. § 47-25-101, *et seq.*

26   dd.   Utah, Utah Code. Ann. § 76-10-3101, *et seq.*

27   ee.   Vermont, 9 V.S.A. § 2453a(a)

28   ff.   West Virginia, W.V. Code § 47-18-1, *et seq.*

**CLASS ACTION COMPLAINT**

gg.     Wisconsin, Wisc. Stat. § 133.01, *et seq.*

hh.     Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq.*

## COUNT V:

### UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

212.     Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

213.     By reason of the foregoing, Defendants have violated, and Plaintiff and members of the End-Payor Class are entitled to relief under:

a.     Alaska, Alaska Stat. § 45.50.531.

b.     Arizona, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

c.     Arkansas, Ark. Code §§ 4-88-101, *et seq.*

d.     California, California Bus & Prof. Code §§ 17200, *et seq.*

e.     Connecticut, Conn. Gen. Stat. § 42-110, *et seq.*

f.     Florida, Fla. Stat. § 501.201, *et seq.*

g.     Hawaii, Hawaii Rev. Stat. § 480-2, *et seq.*

h.     Kansas, Kan. Stat. Ann. § 50-623, *et seq.*

i.     Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq.*

j.     Michigan, Mich. Comp. Laws § 445.901, *et seq.*

k.     Minnesota, Minn. Stat. § 325F.69, *et seq.*

l.     Mississippi, Miss. Code § 75-24-1, *et seq.*

m.     Missouri, Mo. Rev. Stat. § 407.020.

n.     Montana, Mont. Code, §§ 30-14-101, *et seq.*

o.     Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq.*

p.     Nevada, Nev. Rev. Stat. §§ 598.0903, *et seq.*

q.     New Hampshire, N.H. Rev. Stat. §§ 358-A:1, *et seq.*

r.     New Jersey, N.J. Stat. § 56-8-1, *et seq.*

s.     New Mexico, N.M. Stat. Ann. §§ 57-12-1, *et seq.*

**CLASS ACTION COMPLAINT**

1    t.    New York, N.Y. Gen. Bus. Law § 349, *et seq.*

2    u.    North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

3    v.    Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

4    w.    South Carolina, S.C. Code Ann., §§ 39-5-10, *et seq.*

5    x.    Vermont, 9 V.S.A. § 2453a

6    y.    Virginia, Va. Code Ann. § 59.1-196, *et seq.*

## COUNT VI:

### UNJUST ENRICHMENT
### (Against All Defendants)

214.   Plaintiff incorporates by reference and re-allege paragraphs 1-192, above, as though fully set forth herein.

215.   Defendants financially benefited from their unlawful acts at the expense of Plaintiff and members of the End-Payor Class, who paid supracompetitive prices for brand and generic Dexilant during the Class Period.

216.   It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the End-Payor Class, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiff and members of the End-Payor Class.

217.   Defendants should be made to disgorge their ill-gotten gains into a constructive trust created for the benefit of Plaintiff and members of the End-Payor Class, from which Plaintiff and members of the End-Payor Class may obtain restitution.

218.   By reason of the foregoing, Plaintiff and members of the End-Payor Class are entitled to relief.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiff be named End-Payor Class Representative, that the undersigned be named Lead End-Payor Class Counsel, and that reasonable notice of this

action, as provided by Rule 23(c)(2), be given to members of the End-Payor Class;

B.      Adjudge that Defendants violated federal antitrust laws, as set forth above;

C.      Adjudge that Defendants violated State antitrust and trade regulation laws, as set forth above;

D.      Award Plaintiff and members of the End-Payor Class actual, treble, punitive, and exemplary damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.      Order disgorgement and restitution;

F.      Enjoin Defendants from their continuing violations of federal and state law;

G.      Grant prospective injunctive relief, including structural relief, to prevent and restrain any future violations of law; and

H.      Grant such other, further, and different relief as may be just and proper.

## XII.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated: May 22, 2025

*/s/ Shana E. Scarlett*
Shana E. Scarlett (SBN 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com

Thomas M. Sobol (*pro hac vice forthcoming*)
Gregory T. Arnold (*pro hac vice forthcoming*)
Whitney E. Street (SBN 223870)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Fanuel Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
grega@hbsslaw.com
whitneyst@hbsslaw.com

**CLASS ACTION COMPLAINT**
011037-11/3200678 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey L. Kodroff (*pro hac vice forthcoming*)
Diana J. Zinser (*pro hac vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, PC**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
jkodroff@srkattorneys.com
dzinser@srkattorneys.com

Stephen C. Richman (*pro hac vice forthcoming*)
**MARKOWITZ & RICHMAN**
123 S Broad Street, Suite 2020
Philadelphia, PA 19109
Telephone: (215) 875-3100
srichman@markowitzrichman.com

*Counsel for Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity and the Proposed Class*

-42-

**CLASS ACTION COMPLAINT**

011037-11/3200678 V1